JOURNAL ENTRY AND OPINION
Defendant appeals from his conviction for murder following a jury trial. He argues:
 I. THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTIONS FOR JUDGMENT OF ACQUITTAL.
 II. THE DEFENDANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 III. THE DEFENDANT'S CONVICTION IS BASED UPON THE IMPERMISSIBLE STACKING OF INFERENCES.
 IV. THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTIONS FOR A NEW TRIAL.
 V. THE TRIAL COURT COMMITTED PREJUDICIAL ERRORS IN ITS EVIDENTIARY RULINGS.
 VI. PROSECUTORIAL MISCONDUCT DURING THE COURSE OF THE TRIAL DEPRIVED THE DEFENDANT OF HIS CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL.
 VII. THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTIONS TO SUPPRESS.
 VIII. DEATH RESULTING FROM FELONIOUS ASSAULT CONSTITUTES INVOLUNTARY MANSLAUGHTER WHICH PRECLUDES AN INDICTMENT FOR MURDER.
We find no error in the trial court proceedings and therefore affirm appellant's conviction.
 PROCEDURAL AND FACTUAL HISTORY
Appellant John J. Pudelski was charged in a two-count indictment filed April 14, 1999. Count one charged him with aggravated murder in violation of R.C. 2903.01 specifically, purposely causing the death of his infant daughter, Ellie Marie Pudelski. Count two charged him with murder; that is, causing the infant's death as a proximate result of committing or attempting to commit felonious assault, a first or second degree felony that is an offense of violence.
Appellant moved the court to suppress oral statements he made to the police, to dismiss the death penalty specification on count one, and to dismiss the murder charge contained in count two of the indictment. After a hearing on the motion to suppress, the court denied all three motions. However, the state was given leave to remove the death penalty specification from the indictment on July 23, 1999.
The case proceeded to trial on August 23, 1999. In addition to the charges of murder and aggravated murder, the jury was also instructed on the lesser included offense of involuntary manslaughter as a proximate result of child endangering. The jury returned a verdict finding appellant not guilty of aggravated murder but guilty of murder. The court sentenced him to fifteen years' to life imprisonment and overruled his motions for acquittal and for a new trial. Appellant timely appealed his conviction and the denial of his post-verdict motions.
In the state's case at trial, the jury heard testimony from appellant's wife (who was also the mother of the infant victim), medical personnel involved in the delivery and postnatal care of the infant, paramedic and emergency room personnel who responded to the 9-1-1 call regarding the child's death, the county coroner and assistant coroner, and a police officer who investigated the matter.
The mother testified that the infant girl was delivered by Caesarian section on March 17, 1999, and she took her home four days later. The infant fed every four hours, approximately two and one-half to three ounces of formula or breast milk at each feeding, and behaved normally. The mother never noticed any injury to the infant's head.
The neonatologist who was present at the infant's birth had noted a caput or bruise under the scalp but above the skull bone on the back of her head. This is a common injury in newborns and does not have any serious effects on the infant's health. A pediatrician who saw the infant on March 18 and 20 reported that he saw no abnormalities. He would not necessarily have noted a caput in his records unless it was an unusual one. He did not note one here. Neither physician noted any cephalohematoma, or swelling and bleeding of the tissue under the bone, which would have been a more serious injury. A home nurse reported that the baby appeared normal and had no bumps or bruises on her head when the nurse saw her on March 23.
The mother testified that the baby behaved normally throughout the day of Sunday, March 28, 1999. The mother fed her at 8:00 or 9:00 p.m.; the baby consumed almost three and one-half ounces at that time. The mother put the baby to bed at approximately 9:30 p.m., then took a cough medication, Nyquil, and went to bed herself. The baby's crib was located in the mother's bedroom.
The mother awakened around 12:00 midnight when the baby cried and got up to feed the child. Appellant, her husband, was not in the room when the mother awakened but came in and offered to feed the baby, although he normally went to bed at that time. This was the first time he had fed the baby; he normally paid no attention to her. The mother then went back to sleep.
The mother awakened at 7:00 a.m. and was immediately concerned because the child had not awakened for her normal feeding at 4:00 a.m. She went to the crib and found the baby in a corner with her head against the bumper pad. Her forehead was cold. The mother picked the baby up and felt for a heart beat but felt none. She observed a lump on the side of the baby's head.
The mother began to yell for appellant to wake up. It was unusual for appellant to be sleeping at this time; he was usually up at 6:30 a.m. Appellant jumped up and took the baby from the mother and left the room, returning with the telephone. He ordered the mother to leave the bedroom and wait in the living room for paramedics to arrive.
Paramedics came and took the baby to Euclid Hospital. Appellant and his wife delayed going to the hospital while appellant woke his two daughters from a prior marriage and readied them for school, then took them to his mother's house. Appellant and his wife proceeded from there to the hospital.
At the hospital, they learned that the baby was dead. They went into a room to see the body, but appellant would not look at her. As they waited in the grieving room for the mother's mother to arrive, appellant said to his wife, Please don't leave me.
The coroner and assistant coroner testified that the baby died as a result of a cerebral edema, or swelling of the brain, which was caused by a blunt impact that also caused a fracture of the skull. They estimated the time of death at approximately 3:00 a.m., and approximately two to three hours after the injury was inflicted. They opined that she was injured after her midnight feeding. The assistant coroner testified that the child would have survived if medical attention had been sought immediately after the injury occurred.
The coroner and assistant coroner both opined that the fracture occurred very recently, certainly less than twenty-four hours before the baby's death. There were no signs of healing around it; the edges of the break were sharp and uncalloused and there was fresh blood at the site. There were no macrophages (clean-up cells) at the site of the fracture, though there were some in the adjacent scalp. They opined that these macrophages were present because of the caput that occurred at birth. There was no evidence the fracture was a new break at the same site as a fracture that had occurred earlier. Macrophages would have been present at the fracture site if the fracture were not new. The fracture could not have occurred after death because the body had to have been alive to pump the fresh blood that had oozed around the area.
The coroner opined that the death was a homicide. She reached this conclusion because the child had a fracture that was not a birth injury, she could not have caused the fracture herself, and nothing accidental had happened, so the injury had to have been inflicted.
Detective Raymond Jorz testified that appellant and his wife came in to the police station together voluntarily on March 31, 1999, and were interviewed separately. Appellant was interviewed by Detective Jorz and Lieutenant Brooks. They asked appellant whether the baby had suffered any accidental injuries, and appellant said she had not. Appellant related that he had fed the baby around midnight and stayed up with her until approximately 1:30 a.m., then put her in her crib after she went to sleep. He went to bed himself and awakened at approximately 3:30 a.m., used the bathroom, then returned to bed. He did not check on the baby at that time. His wife woke him the following morning after she found the baby cold and unresponsive.
When police informed appellant that the baby had a skull fracture, appellant suggested that the fracture was caused by the emergency medical technicians or that the coroner was examining the wrong child. He denied knowledge of any injury.
 LAW AND ANALYSIS Sufficiency of the Evidence
Appellant's first assignment of error argues the court should have granted his motion for acquittal because the state failed to produce evidence that appellant inflicted injury upon the child or that he did so with the requisite criminal intent. A motion for acquittal raises the question of the sufficiency of the evidence to support a conviction. When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Dennis (1997),79 Ohio St.3d 421, 430; State v. Jenks (1991), 61 Ohio St.3d 259. Sufficiency is a test of adequacy; that is, whether the evidence is legally sufficient to sustain the verdict as a matter of law. State v. Thompkins (1997), 78 Ohio St.3d 380, 386.
The jury found appellant guilty of causing the infant's death as a proximate result of committing felonious assault. R.C. 2903.02(B). Felonious assault is defined as knowingly causing serious physical harm to another. R.C. 2903.11(A).
Viewed in the light most favorable to the state, the circumstantial evidence presented by the state indicates that the child suffered a fractured skull and cerebral edema as a result of a blunt force trauma that occurred while the child was in the sole physical possession of appellant. Although appellant denied any accident occurred, the baby could not have injured herself. A rational jury could conclude, from the absence of evidence of any other explanation for the child's injuries, that it was appellant who inflicted them because he was the only person who reasonably could have inflicted them. There was also evidence that these injuries were serious in that they carried a substantial risk of death. R.C. 2901.01(A)(5)(b).
A rational jury could infer that the fracture and edema were knowingly inflicted. The assistant coroner testified that this injury was inflicted with some force, and the medical evidence suggested that it occurred during the time that the child was in appellant's care, yet appellant denied any injury occurred. Appellant even suggested it was caused after death by emergency personnel, although that was not medically possible. A rational jury could conclude that appellant made these false assertions in order to deflect suspicion from himself. The falsehoods, combined with appellant's plea to his wife to please don't leave me, support the conclusion that appellant injured the infant knowingly.
In addition, appellant denied that he checked on the baby at 3:30 a.m. when he got up to use the bathroom, and he did not get up at his usual time to prepare to go to work. Viewed in the light most favorable to the state, and taken together with the fact that appellant did not seek medical attention for the child after she was injured, a reasonable jury could infer that appellant was aware that he had harmed the child and sought deniability by ensuring that his wife would discover the infant was injured. This evidence also supports the inference that he knowingly injured the child. Therefore, the court did not err by overruling appellant's motion for acquittal. The first assignment of error is overruled.
 Inference upon Inference
The third assignment of error claims the state's case was constructed from circumstantial evidence that impermissibly required the jury to make inferences based entirely upon other inferences. Like the first assignment of error, this argument suggests that the evidence was insufficient to support appellant's conviction.
While the circumstantial evidence certainly required the jury to draw inferences in order to reach its conclusions, [m]urder convictions * * * can rest solely on circumstantial evidence. State v. Lott (1990),51 Ohio St.3d 160, 167. Inferences cannot be built on other inferences, but several conclusions can be drawn from the same set of facts, and a permissible parallel inference may be based in part on another inference and in part upon additional facts. Hurt v. Rogers Transportation Co. (1955), 164 Ohio St. 329, paragraphs one through three of the syllabus. As the foregoing discussion makes clear, the inference that appellant injured the infant, and the inference that he did so knowingly, are based upon difference evidence; hence, there was no impermissible inference upon an inference and the third assignment of error is overruled.
 Manifest Weight of the Evidence
The second assignment of error contends that the conviction contravenes the manifest weight of the evidence. In contrast to our review of the sufficiency of the evidence, an evaluation of the manifest weight of the evidence requires this court to consider the entire record, weigh the testimony and other evidence, and determine whether the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Martin (1983), 20 Ohio App.3d 172, 175 (cited with approval in State v. Thompkins [1997], 78 Ohio St.3d 380, 387).
Appellant does not explain how the evidence demonstrates that the jury clearly lost its way. Although there was no direct evidence as to how the fracture and cerebral edema were inflicted, appellant's assertion that the cause was as likely to be accidental as criminal is an exaggeration in light of appellant's own statement to the police that no accidental injuries occurred while he was caring for the infant. There is considerable circumstantial evidence that appellant knowingly inflicted the injury that caused the infant's death; it is not necessary to have evidence of the precise manner in which he inflicted the injury in order to find him guilty. Accordingly, we overrule the second assignment of error.
 Motion for New Trial
Appellant's fourth assignment of error asserts the trial court erred by denying his motion for a new trial based on newly discovered evidence. The newly-discovered evidence appellant produced to the trial court was a photograph of the baby taken during her first full day of life. This photograph shows a large bruise on the back of the baby's head. In addition, appellant presented a demonstrative exhibit that showed that this bruise overlaid the area where the skull fracture occurred.
Crim.R. 33(A)(6) provides that:
 A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:
* * *
 (6) When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at trial. * * *
A motion for a new trial is addressed to the discretion of the trial court, and the court's ruling will not be disturbed on review absent a showing that the trial court abused its discretion. State v. Hill (1992), 64 Ohio St.3d 313, 333.
The supreme court, in State v. Petro (1947), 148 Ohio St. 505, syllabus, set forth the factors a trial court must consider in deciding a motion for a new trial based upon newly discovered evidence:
 To warrant the granting of a motion for a new trial in a criminal case based on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong possibility that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence.
We agree with the trial court that the photograph and demonstrative computer model are merely cumulative of other evidence already presented to the jury at trial. The caput the child had at birth was not new evidence it was noted in the medical records of the child's birth, although it was inconsistently noted later because some of the medical providers consider caputs to be so common that they are not a noteworthy abnormality. There was also testimony at trial that the caput was in the same vicinity as the fracture. The assistant coroner testified that there were macrophages in the tissue above the fracture, which was indicative of healing, and he attributed their presence to the caput. Accordingly, appellant has not shown that the trial court abused its discretion by denying his motion for a new trial based upon newly discovered evidence.
 Evidentiary Issues
Appellant next complains that the court abused its discretion to his prejudice in several rulings on the admission and exclusion of evidence.
Complaint to Department of Human Services. First, appellant urges that the court erred by allowing the prosecution to cross-examine his former wife about a statement she made to a social worker regarding verbal and emotional abuse by appellant. Appellant called his former wife, Michelle Brown, to testify regarding his reputation and character. On direct examination, she said that appellant was a nice, caring, nurturing husband. On cross-examination, the court permitted the state, over objection, to inquire whether Ms. Brown had made complaints regarding [appellant], of verbal and emotional abuse towards both [her]self and [her] children. Ms. Brown denied that she made any such complaint. The prosecutor then asked her if it would help her to remember if she saw a record from the Department of Human Services. She replied, I could see it. But I don't recollect anything, me saying anything like that.
We agree with the trial court that this was a permissible inquiry into prior statements and acts that were inconsistent with her testimony on direct that appellant was a nurturing husband. The state had a good faith reason to inquire based on DHS records. Cf. State v. Gillard (1988),40 Ohio St.3d 226, paragraph two of the syllabus. Brown denied she made complaints and denied that the agency's records would aid her recollection, and the prosecutor did not inquire further on that point. Thus, there is no question about the introduction of extrinsic evidence of prior inconsistent statements under Evid.R. 613(B).
Assistant Coroner's Research. Next, appellant claims the court erred by allowing the assistant coroner, Dr. Felo, to testify about a research project he performed. At trial, the assistant coroner used demonstrative exhibits from other files in the coroner's office to show the healing processes that take place to injuries as they get older, for purposes of comparison to the recent injury that had been inflicted on this infant. Appellant contends that the assistant coroner did not conduct the research project that led to this evidence in a manner calculated to yield accurate results and, therefore, the court should have excluded the resulting exhibits.
Appellant would have this court treat these exhibits as a kind of scientific test result that forms the basis of an expert opinion; however, Dr. Felo clearly did not rely on these exhibits as a basis for his opinion, so the manner in which he found them is irrelevant. Their purpose was to show the healing processes that would be evident in injuries of the type the infant suffered if the injuries had occurred earlier. As such, they were proper demonstrative exhibits.
Hypothetical Questions. Appellant next complains that the court improperly allowed the assistant coroner to opine about the time of the infant's injury and death without a proper foundation. The assistant coroner testified that, assuming knowledge of the last time the infant ate, factors that would be important in determining the time of injury would include the stomach contents, the tissue reactions, and her activity level. He did not say that all of that information was essential to reaching a conclusion or that he could not form an opinion without evidence of all of those factors.
The only item about which the assistant coroner did not have specific information was the infant's activity level. The other factors were covered in some detail in the record. There is no indication that the infant's activity level was necessary to the formation of an opinion as to the time of injury or death.
Letter to the Editor. Next, appellant argues that the court abused its discretion by allowing the state to cross-examine a defense expert, Dr. Leestma, regarding a letter to the editor in connection with another case, in which some fifty pediatricians criticized the theory that Dr. Leestma propounded both in that case and in this one: that capillaries formed as a result of an old injury could spontaneously burst, causing a large hemorrhage of the kind found on the infant's head. Dr. Leestma responded to this letter with a letter of his own. No part of either letter was presented to the jury, though their basic contents were discussed at sidebar.
The sidebar discussion among the court and counsel revealed the purpose of this cross-examination was to demonstrate that Dr. Leestma became personally, emotionally attached to his opinions and, therefore, was not objective but adversarial. We agree with the trial court that this is an appropriate subject of cross-examination for an expert witness. The court then permitted the prosecutor to cross-examine Dr. Leestma specifically on his ability to maintain an objective viewpoint. We perceive no error in the court's rulings here.
Police Reports. Finally, appellant argues that he should have been allowed to review the police report upon which the coroner relied in reaching her conclusion that the infant's death was a homicide. Though appellant argues the report had to be disclosed to him because it was used to refresh Dr. Balraj's recollection, the record does not show that Dr. Balraj used the report to refresh her recollection.
Therefore, we overrule the fifth assignment of error.
 Prosecutorial Misconduct
Appellant's sixth assignment of error claims he was denied a fair trial because of improper remarks made by the prosecutor. The remarks he complains about were made in closing arguments. The court sustained appellant's objection to three of these remarks; in other instances, the court reminded the jury that this was argument and that the credibility of the witnesses was for the jury to decide. Given the court's rulings and instructions, appellant was not denied a fair trial by the prosecutor's arguments. State v. Apanovich (1987), 33 Ohio St.3d 19, 24.
 Motion to Suppress
Appellant's seventh assignment of error contends the court erroneously denied his motion to suppress the statements he made to the Euclid police before he was given Miranda warnings. He argues that the totality of the circumstances demonstrated that the interview was a custodial interrogation that violated the Fourth Amendment because appellant was not given Miranda warnings earlier.
In determining whether a person is in custody for purposes of receiving Miranda protection, the ultimate inquiry is simply whether there is a `formal arrest or a restraint on freedom of movement' of the degree associated with a formal arrest. California v. Beheler (1983),463 U.S. 1121, 1125. This is a mixed question of law and fact. The court's findings about the circumstances surrounding the interrogation are factual determinations entitled to a presumption of correctness, but the determination whether, under those circumstances, a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave is a mixed question requiring application of a legal standard to the historical facts. Thompson v. Keohane (1995),516 U.S. 99, 112.
Appellant urges that the totality of the circumstances reflect[s] the true facts John was never going to leave the police station once he entered it. However, appellant presented himself at the police station for questioning voluntarily; he was not escorted. The police at that time only knew the child had died from a skull fracture; they did not know how it occurred. Appellant was not handcuffed and was not told he could not leave. The fact that questioning took place at the police station does not, in itself, render the interrogation custodial. Beheler,463 U.S. at 1125. Nor does the fact that he was ultimately arrested mean that he was in custody throughout the entire interrogation.
Appellant argues that it was clear that the police never intended to let him leave because his wife told the police she knew nothing about the fracture in the baby's skull and was allowed to leave, while he denied knowledge of it and was arrested. This was not the only question they were asked, however, and their circumstances were unquestionably different. Therefore, we cannot say that the differing treatment of appellant and his wife, despite their similar answers to the same question, demonstrates that appellant was in custody throughout the interrogation.
Given appellant's voluntary appearance at the police station for the interview, a reasonable person in appellant's position would have felt free to terminate the interrogation and leave at any time. Until he was arrested, there was no indication that he was not free to go. Therefore, we overrule the seventh assignment of error.
 Motion to Dismiss Murder Charge
Appellant's final assignment of error contends that the court erred by denying his motion to dismiss the murder charge. Appellant was charged with having caused the death of another as a proximate result of committing felonious assault, in violation of R.C. 2903.02(B). R.C.2903.02(B) provides:
 No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.
Appellant claims that causing the death of another by means of felonious assault is involuntary manslaughter and that the state is prohibited by the plain language of R.C. 2903.02(B) and R.C. 2901.04(A) from bootstrapping involuntary manslaughter into a charge of murder. Involuntary manslaughter is defined as causing the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony. R.C. 2903.04(A).
While we agree that the offense with which appellant was charged could also constitute involuntary manslaughter, this fact alone did not preclude the state from charging appellant with the higher offense of murder. The elements of a murder charge include more specific requirements as to the degree and nature of the underlying felony than does the offense of involuntary manslaughter. Rather than bootstrapping an involuntary manslaughter charge into murder, the involuntary manslaughter charge may be considered a lesser-included offense of murder. State v. Kidder (1987), 32 Ohio St.3d 279, 282. Therefore, the eighth assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 _________________________________ KENNETH A. ROCCO, PRESIDING JUDGE
MICHAEL J. CORRIGAN, J. and TERRENCE O'DONNELL, J. CONCUR.